## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA BEAUCHAMP,<br>Norristown, PA 19403 | : |
| | : **CIVIL ACTION NO.** |
| RALPH CREWS,<br>Doylestown, PA 18901 | : **JURY TRIAL DEMANDED** |
| and | : |
| WILLIAM GRUCCIO,<br>Doylestown, PA 18902 | : |
| Plaintiffs, | : |
| v. | : |
| THE PENN MUTUAL LIFE<br>INSURANCE COMPANY<br>600 Dresher Road<br>Horsham, PA 19044 | : |
| Defendant. | : |

## COMPLAINT

## I.    PRELIMINARY STATEMENT

Defendant, The Penn Mutual Life Insurance Company, maintains a culture of age discrimination that begins at the highest levels and affects all employment decisions.

In 2009, Defendant undertook a course of action designed to terminate older workers from its home office through centrally planned layoffs conducted in a series of waves over the course of the year and into early 2010. These mass terminations were generally described as being aimed at reducing costs by reducing the "head count" of the Horsham headquarters. In actuality, the layoffs were designed to, and did, discriminatorily remove older workers from employment with Defendant. The President,

Chief Executive Officer, and Chairman of Defendant even acknowledged that the terminations of the Plaintiffs were part of an effort to "go younger." This "go younger" directive is part of the culture of age bias that has existed at Defendant for years. Defendant knowingly makes decisions based on stereotypes of older workers as less productive and less energetic than younger workers and based on assumptions regarding the number of work years older workers have remaining. The culture created by Defendant not only tolerates, but encourages, discussion of these issues and consideration of these stereotypes when making employment decisions, including hiring, promotion, and termination decisions.

Defendant then deceived each laid-off worker aged forty or over by presenting them with a fraudulent release agreement that falsely stated that the employee was releasing their federal age discrimination claims against Defendant in exchange for severance ("Release").

Federal law requires an employer seeking to obtain a release of age discrimination claims from a worker terminated as part of a group layoff to provide certain data and information regarding the group layoffs to allow the terminated worker to make an informed choice whether or not to sign a waiver agreement. But the deceptive and invalid release agreements given to the laid-off workers by Defendant failed to comply with this federal law, a law specifically designed to protect older workers by ensuring that any attempted waiver of age discrimination claims is made knowingly. By withholding complete and accurate layoff information from the terminated workers (among other deficiencies fatal to the releases), Defendant not only violated the Older Workers Benefits Protection Act, but also concealed the true impact of the layoffs

on older workers.  Defendant intentionally misled its workers, explicitly stating in each release agreement that the worker was giving up their claims under the Age Discrimination in Employment Act, even though Defendant knew that this statement was false because of its failure to comply with the federal requirements.  This deception meant that each older worker was unaware that he or she retained the right to pursue claims of age discrimination against Defendant.

Patricia Beauchamp, Ralph Crews, and William Gruccio ("Named Plaintiffs"), were long-serving, high-ranking employees of Defendant who were each told on November 16, 2009, that they were being let go as part of the larger reorganization. Each was over the age of forty and terminated as part of these mass layoffs because of their ages.  Each Named Plaintiff, as well as all other older workers let go as part of the group layoff, was presented with a fraudulent and invalid release agreement at the time they were notified of their termination.

Named Plaintiffs now bring this action against Defendant for violation of the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 621, *et seq.* Named Plaintiffs bring this action as a collective action pursuant to the ADEA, 29 U.S.C. § 626(b), incorporating section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), on behalf of themselves and all other age 40 or older former employees of Defendant who were terminated during 2009 and 2010 as part of an alleged reduction in force.

The Named Plaintiffs seek an Order providing that notice of this lawsuit be given to each person who was 40 years old or older and whose employment at Defendant's main office was terminated by Defendant during 2009 or 2010 as part of an alleged

reduction in force ("Older Workers").  This notice should advise the Older Workers that
(1) any release agreement that they may have signed from Defendant did not, in fact,
release Defendant from claims of age discrimination under the ADEA; (2) this action is
alleging that Defendant's reduction in force was age discriminatory (3) each Older
Worker has the right to opt-in to this lawsuit as a plaintiff; and (4) the Older Workers do
not repay any consideration that they received in exchange for signing a release in
order to opt-in to this lawsuit.

In addition, the Named Plaintiffs seek injunctive and declarative relief, damages,
including compensatory and liquidated damages, and all other relief under the ADEA
and any other relief that this Court deems appropriate.

## II.   PARTIES

1.      Plaintiff Patricia Beauchamp is an individual and citizen of the
Commonwealth of Pennsylvania, residing therein in Norristown, PA 19403.

2.      Plaintiff Beauchamp was born in September, 1952, and is currently fifty-
eight (58) years of age.

3.      Plaintiff Ralph Crews is an individual and citizen of the Commonwealth of
Pennsylvania, residing therein in Doylestown, PA 18901.

4.      Plaintiff Crews was born in August, 1949 and is currently sixty-one (61)
years of age.

5.      Plaintiff William Gruccio is an individual and citizen of the Commonwealth
of Pennsylvania, residing therein in Doylestown, PA 18902.

6.      Plaintiff Gruccio was born in November, 1949 and is currently sixty-one
(61) years of age.

7.     Defendant, The Penn Mutual Life Insurance Company, is a mutual insurance company owned by its policyholders.

8.     Defendant is registered to do business in the Commonwealth of Pennsylvania and has its headquarters and home office ("Home Office") at 600 Dresher Rd., Horsham, PA 19044.

9.     Defendant is engaged in an industry affecting interstate commerce and, at all relevant times, has regularly conducted business in the Commonwealth of Pennsylvania.

10.    At all times material hereto, Defendant has acted as an "employer" within the meaning of the ADEA.

11.    At all times material hereto, Defendant employed more than twenty (20) people.

12.    At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen and/or employees within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

13.    At all times material hereto, Named Plaintiffs were employees of Defendant within the meaning of the ADEA.

## III.    JURISDICTION AND VENUE

14.    The causes of action set forth in this Complaint arise under the ADEA, as amended by the OWBPA, 29 U.S.C. § 621, *et seq*.

15.    The District Court has jurisdiction over the claims pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.

16.    Venue is proper under 28 U.S.C. § 1391(b).

17.     On or about May 24, 2010, Plaintiff Beauchamp filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Attached hereto, incorporated herein and marked as Exhibit "A" is a true and correct copy of Plaintiff Beauchamp's Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

18.     More than sixty (60) days have passed since Plaintiff Beauchamp filed her Charge with the EEOC.

19.     On or about March 18, 2010, Plaintiff Crews filed a Charge of Discrimination with the EEOC.  Attached hereto, incorporated herein and marked as Exhibit "B" is a true and correct copy of Plaintiff Crews' EEOC Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

20.     More than sixty days have passed since Plaintiff Crews filed his Charge.

21.     On or about March 18, 2010, Plaintiff Gruccio filed a Charge of Discrimination with the EEOC.  Attached hereto, incorporated herein and marked as Exhibit "C" is a true and correct copy of Plaintiff Gruccio's EEOC Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

22.     More than sixty days have passed since Plaintiff Gruccio filed his Charge.

23.     Plaintiffs have fully complied with all administrative prerequisites for the commencement of this action.

**IV.    FACTUAL ALLEGATIONS**

Defendant's Culture of Age Discrimination

24.     Defendant maintains a culture of age discrimination that begins at the highest levels and affects all employment decisions.  Defendant knowingly makes

decisions based on stereotypes of older workers as less productive and less energetic than younger workers and based on assumptions regarding the number of work years older workers have remaining.  The culture created by Defendant not only tolerates, but encourages, discussion of these issues and consideration of these stereotypes when making employment decisions, including hiring, promotion, and termination decisions.

25.     Defendant requires its managers to engage in succession planning, which is a euphemism for hiring younger workers to replace older workers who are assumed to be declining in productivity.

26.     Defendant not only assumes that older workers will decline in productivity, but further assumes that it will not be able to prove any alleged "decline," making it difficult to terminate older workers.

27.     Executives of Defendant, including Eileen McDonnell, currently Defendant's President and formerly Defendant's Executive Vice President and Chief Marketing Officer, have directed their reports to hire individuals who are ten to fifteen years younger than the person they are anticipated to replace.  She considers this time a "ramp."

28.     Ms. McDonnell herself was hired as an intended replacement for Robert Chappell, currently Defendant's Chief Executive Officer and Chairman, who is roughly fifteen years older than Ms. McDonnell.

29.     Managers of Defendant, including Plaintiffs, have explicitly been told to consider the "ramp" period when making hiring decisions.

30.     Plaintiff Crews and Plaintiff Gruccio were involved in interviewing new Vice President hires in 2008 and 2009.  They were aware that Ms. McDonnell considered

7

younger age to be an asset for a candidate. The individuals ultimately hired were between ten and fifteen years younger than themselves.

31.    Defendant openly discussed a need to create promotional opportunities for younger workers by getting rid of older workers who blocked advancement.

32.    Shortly after the discriminatory layoffs giving rise to this action were complete, it was announced that Ms. McDonnell would be replacing Mr. Chappell as President. In October, 2010, Mr. Chappell announced that Ms. McDonnell would be replacing him as CEO. In the press release announcing her ascendancy to the CEO position, Mr. Chappell praised Ms. McDonnell's "leadership" as shown by the "high-energy and productive teams she has built at the home office." The team she has built at the home office is the result of hiring younger workers to increase the "head count" and then terminating older workers through layoffs designed to reduce the increased head count.

33.    Members of Defendant's management, including Mr. Chappell and Ms. McDonnell, have participated in discussions premised on the idea that older workers in sales would be less productive and would just "coast" on revenue from past sales that they have made. These older workers are referred to by Defendant as "retired on active duty."

34.    Plaintiff Crews was present at executive-level meetings where Defendant wanted to institute a mandatory retirement age for its field managers. After being informed that such an action would be illegal, Defendant set about to create a scheme to reach the same result without appearing to break the law.

35.    Defendant decided to obtain commitments from its older field workers to

retire at a certain age and not attempt to work past a certain age in exchange for additional compensation.

36.     By way of example, Ms. McDonnell ordered Plaintiff Crews to obtain such agreements from Field Managers Paul Vignone, Frank DePaolo, and Frank Palmieri.

37.     Defendant continues to seek out such agreements even after the Layoffs. In early 2010, a representative of Defendant approached Charlie Parks, Field Manager, with such an offer.  Mr. Parks (approximately 60 years old) became upset and responded that he had no intention of retiring.

38.     Executives of Defendant have explicitly commented on Defendant having too many older Field Managers and instructed that Defendant "hire field managers that were born after the Eisenhower administration."

39.     In or around December, 2009, Robert Chappell, then the President, CEO, and Chairman of Defendant, acknowledged that a desire to "go younger" was a consideration in selecting individuals for termination as part of Defendant's mass terminations that took place through 2009 and 2010.

40.     In presenting fraudulent Releases to the forty year old and older workers terminated in 2009 and 2010 as part of the alleged reduction in force or reorganization, as described herein, Defendant attempted to harm older workers by causing them to falsely believe that they could not pursue a claim of age discrimination if they signed the Release.

41.     The fraudulent Releases created by Defendant and given to the Older Workers and the Named Plaintiffs violated a statute specifically designed to protect the benefits of older workers.

42.     On or about March 18, 2010, Defendant received copies of Plaintiff Crews' EEOC Charge and Plaintiff Gruccio's EEOC Charge, each putting Defendant on notice of the defects in the Releases.

43.     In response to receiving the EEOC Charges of Plaintiff Crews and Plaintiff Gruccio, Defendant took no steps to notify the misled Older Workers of their rights or to otherwise remedy the defects in the Releases.

44.     Defendant has engaged in a pattern and practice of discriminating against older employees.

45.     Defendant tolerates, accepts, and promotes a workforce where management openly expresses hostility and bias against older workers.

### Defendant's 2009 and 2010 Mass Layoffs

46.     In early 2009, Defendant decided to reduce the number of employees, or "head count," that were located at its Home Office.  This was conducted through mass layoffs that were conducted during 2009 and 2010 ("Group Terminations" or "Layoffs"). The stated goal of the Group Terminations was to return the headcount to its 2007 level. This would require terminations of approximately 50 to 100 employees.

47.     Upon information and belief, many of the new employees that had been hired between 2007 and 2009, increasing the headcount, had been younger workers.

48.     These younger workers were not the targets of the intended reduction.  To the contrary, upon information and belief, approximately 70% of the employees that Defendant selected to terminate had been employed by Defendant before 2007.

49.     The planning and execution of the Group Terminations involved the highest levels of Defendant's organization.

50.     During 2009 and 2010, Robert Chappell was the President, Chief Executive Officer, and Chairman of the Board of Defendant.

51.     During 2009 and 2010, Eileen McDonnell was an Executive Vice President and Chief Marketing Officer of Defendant.

52.     During 2009 and 2010, Ed Clemons was the Senior Vice President of Human Resources of Defendant.

53.     Ms. McDonnell and Mr. Clemons both reported to Mr. Chappell, the President, CEO, and Chairman.

54.     Mr. Chappell, Ms. McDonnell and Mr. Clemons are members of Defendant's highest levels of management and all were involved in the layoffs conducted during 2009 and 2010.

55.     Both Mr. Chappell and Ms. McDonnell made statements indicating the goal of the Group Terminations was to reduce the total headcount at the Home Office.

56.     Meetings to plan the Group Terminations were conducted involving all levels of management from all areas of the Company.

57.     Mr. Clemons or Ms. McDonnell or both were present at many of these meetings and Ms. McDonnell was present at most of these meetings.

58.     During these meetings, lists were developed of the people to be terminated or, as Defendant euphemistically referred to them, "2009-2010 Job Eliminations."

59.     The lists of persons to be terminated included the ages of each person selected for termination.

60.     The lists of persons to be terminated included other information, such as

the person's date of hire, department, and title.

61.     The lists of persons to be terminated also included the date on which Defendant planned to notify each person of their termination.

62.     These lists set forth the information, including age, that Defendant considered pertinent to the planning of the Group Terminations.

63.     These lists demonstrate the central planning of the Group Terminations across all departments and all time periods.

64.     The lists demonstrate that even though Defendant conducted the Layoffs at different times, it was aware of all people who were going to be laid-off.

65.     Some older workers appear on the list as having been selected for termination, but it is noted with the word "Retirement" in quotations.  When these employees were terminated, Defendant claimed that the workers had retired.

66.     The individuals selected for termination skewed so heavily by age, that at one meeting, Ms. McDonnell made a remark to the effect that Defendant was "really letting go of a lot of older workers."

67.     No actions were taken to investigate or remedy any disparate treatment or impact of older workers as part of the layoffs in response to Ms. McDonnell's statement.

68.     Defendant employed a flawed selection process so as to allow decision-makers to act on their age bias and eliminate older workers.

69.     Shortly after the terminations of Plaintiffs, Mr. Chappell remarked, in reference to the termination of Plaintiff Gruccio, that Defendant had wanted to "go younger with its Leadership Team" (which included Plaintiffs Beauchamp, Crews, and Gruccio).

70.     The process by which Defendant selected employees for termination as part of the Layoffs was highly susceptible to, and infected with, age-bias.

71.     The selections of which employees to terminate were entirely subjective, with managers being granted discretion on deciding whom to terminate.

72.     The process by which Defendant selected employees for termination as part of the Layoffs lacked any safeguards or protections against age bias of the decision-makers.

73.     There were no uniform or objective criteria utilized by Defendant in conducting the Layoffs other than age.

74.     Upon information and belief (and based in part upon the inference to be drawn by Defendant's failure to provide terminated workers with the comparative data as required by the OWBPA), workers aged forty (40) and older were terminated at a higher rate as part of the Layoffs than those under the age of forty (40).

75.     The Layoffs had a disparate impact on workers aged forty (40) and over.

76.     Defendant was aware that the selection decisions made as part of the Group Terminations would result, and did result, in a disparate and discriminatory impact on older workers.

77.     Defendant intentionally discriminated, on the basis of age, against the Named Plaintiffs and Older Workers in connection with the termination decisions and the fraudulent release scheme that it engaged in.

78.     Defendant executed the Layoffs over time and kept its workers in the dark as to the scope of the layoffs and the decision-making process in order to conceal the discrimination against older workers.

### Defendant Provided Fraudulent, False, and Misleading
### Release Agreements To Older Workers

79.    The severance and release agreements ("Releases") given by Defendant to the laid-off employees, including the Named Plaintiffs, fraudulently purported to release Defendant from claims under the ADEA despite Defendant's knowledge that the Releases did not comply with the OWBPA and therefore violated the ADEA.

80.    The Releases given by Defendant to the Older Workers, including the Named Plaintiffs, are not valid releases of claims under the ADEA.

81.    Defendant knowingly failed to comply with the OWBPA requirements in presenting releases to the laid-off workers age 40 or over, including the Named Plaintiffs.

82.    Defendant misled Older Workers, including the Named Plaintiffs, in an attempt to prevent them from bringing age discrimination claims against Defendant.

83.    Defects rendering the Releases invalid as to claims under the ADEA include, without limitation:

      a.    Defendant did not properly identify the eligibility factors or criteria used to determine which employees would be separated from the company.

      b.    Defendant did not properly identify the decisional unit considered for termination.

      c.    Defendant, depending on the individual, either failed to provide any information regarding the ages and positions of all individuals retained or terminated as part of the group layoff or provided incorrect and incomplete data.

14

d.   Defendant intentionally conducted the layoff in waves over a period of time, concealing the true extent of the layoffs and denying the laid-off employees access to complete lists of the ages and titles of all employees terminated and retained.

e.   At least some Older Workers, including Named Plaintiffs, were given only twenty-one (21) days to review and sign the Agreements, rather than the forty-five (45) days to review and sign it that are required by the OWBPA to be given in cases of group layoffs.

f.   Defendant implied that the Older Workers must sign the release to receive compensation that they were already entitled to receive (e.g. earned performance bonuses).

g.   The Agreements do not advise that the employee may still file a Charge of Discrimination with the EEOC.

84.   By way of example of the invalidity of the Releases, the OWBPA requires that employers conducting a group layoff, such as Defendant, provide the titles and ages of the employees retained and laid-off ("Demographic Data").

85.   The purpose of the Demographic Data, according to the OWBPA regulations, is to provide employees with enough information regarding layoffs to make an informed choice whether or not to sign a waiver agreement.  Defendant withheld this Demographic Data, preventing the Older Workers from making an informed choice whether to sign the Releases.

86.   The Releases prepared by Defendant and given to the Older Workers,

including Named Plaintiffs, do not contain complete and accurate Demographic Data.
For instance, even though the decisional unit for the layoffs was the entire work force at
the Home Office (as evidenced by the complete lists of terminated employees created
and circulated among the highest levels of Defendant and the stated goal to reduce
head count at the Home Office), none of the Older Workers were given Demographic
Data for the Home Office.

87.    For some Older Workers, like Named Plaintiffs, no Demographic Data at
all was given.  For other Older Workers, only misleading and incomplete Demographic
Data was provided.

88.    None of the Releases provided any Demographic Data about any
individuals who were terminated in a different wave of the layoffs.  For instance, an
individual let go in September, either received no Demographic Data whatsoever or did
not receive any information on individuals who were let go before September or after
September, even though Defendant had a complete list of lay-offs.

89.    Defendant failed to provide complete Demographic Data to the Older
Workers, despite falsely telling each person that received any Demographic Data that
the data being provided was complete.

90.    Older Workers who did receive some Demographic Data were told, as part
of the Release, that they were being given a list that "provides the job titles and ages of
all employees who will be terminated from their employment with Penn Mutual Life
Insurance Company as a result of the Reduction in Force."  They were also told that
they were being given a list that "provides the job titles and ages of all employees
whose employment could have been, but is not being, terminated as a result of the

Reduction in Force." These statements are false. The Releases did not provide the job titles and ages of all people terminated as a result of the reduction in force nor the job titles and ages of all people who could have been, but were not, terminated as a result of the reduction in force.

91.     Defendant knew that it was required to give Demographic Data to the Older Workers, including Named Plaintiffs, in order to obtain a valid release of claims under the ADEA.

92.     One of the first employees terminated as part of the reduction in force was a fifty-five (55) year old Vice President of Human Resources who was let go on or about July 16, 2009.

93.     Defendant did not give the Vice President of Human Resources any Demographic Data. However, because of her background, she was aware of the OWBPA requirements and requested the Demographic Data. Rather than taking the position that such information was not necessary, Defendant gave her some of the requested information.

94.     Even after providing some Demographic Data to its terminated Vice President of Human Resources, Defendant continued to give either no Demographic Data or incomplete Demographic Data to other Older Workers, including Named Plaintiffs.

95.     The fraud committed by Defendant by telling the Older Workers, including Named Plaintiffs, that they were releasing ADEA claims when they were not releasing and, in fact, retained such claims, **operated only to the detriment of workers aged 40 and over and only misled workers aged 40 and over.** There are no requirements for

the form or content of a release being provided to terminated employees under the age of 40. Moreover, workers under the age of 40 are not protected by the ADEA and, therefore, have no claims or potential claims under that statute.

96.    A non-fraudulent Release would have stated that the Older Workers and the Named Plaintiffs were releasing Defendant of any and all claims **except for** claims of age discrimination under the Age Discrimination in Employment Act because Defendant had chosen not to provide the information required by the Older Workers Benefits Protection Act.

Plaintiff Patricia Beauchamp

97.    Plaintiff Beauchamp was hired by Defendant on or about July 31, 1995 and was employed by Defendant for more than fourteen (14) years before she was laid-off.

98.    In or about August, 1997, Plaintiff Beauchamp was promoted to the position of Vice President, Corporate Communications, the position she held for more than twelve (12) years until her termination. Plaintiff Beauchamp was also a member of Defendant's Executive Team.

99.    As Vice President, Corporate Communications, Plaintiff Beauchamp was responsible for the strategies and tactics surrounding the company's internal and external communications, public relations, trade advertising, website development, incentive conferences and recognition programs, and meeting management.

100.    Plaintiff Beauchamp performed her job in a fully satisfactory manner.

101.    Plaintiff Beauchamp was qualified for her position as Vice President, Corporate Communications.

102.    At the time of her termination, Plaintiff Beauchamp reported to Ms. McDonnell, who reported directly to Mr. Chappell.

103.    At the time of her termination, Plaintiff Beauchamp was the second oldest of five Vice Presidents and Senior Vice Presidents reporting to Ms. McDonnell.

104.    On November 16, 2009, the two oldest people reporting to Ms. McDonnell were terminated.

105.    On November 16, 2009, Ms. McDonnell and Mr. Clemons informed Ms. Beauchamp that she was being terminated as part of the reduction in force at Defendant's home office.

106.    Plaintiff Beauchamp was terminated as part of the Group Terminations designed to reduce headcount at Defendant's Home Office.

107.    Plaintiff Beauchamp was one of at least three people at the Vice President or higher level under Ms. McDonnell, who were informed of their termination on November 16, 2009.

108.    Plaintiff Beauchamp was told that her termination had nothing to do with her performance.

109.    Plaintiff Beauchamp was given a letter informing her that her termination "was not intended to reflect on [her] personally" but was part of a "business decision to realign our staffing needs."

110.    All people terminated on November 16, 2009, were given substantially identical letters (differing only in names and dates), indicating that their termination was part of the same "business decision to realign [Defendant's] staffing needs."

111.   Upon information and belief, all people terminated by Defendant as part of the Layoffs were given substantially identical letters (differing only in names and dates), indicating that their termination was part of the same "business decision to realign [Defendant's] staffing needs."

112.   At the time of her termination, Plaintiff Beauchamp was given a Release, purporting to release Defendant of all claims, including claims under the ADEA, in exchange for severance payment ("Beauchamp Release").

113.   All people terminated on November 16, 2009, were given documents substantially identical to the Beauchamp Release (differing only in names, dates, and amounts of severance).

114.   Upon information and belief, all people terminated by Defendant as part of the Layoffs were given substantially identical Releases (differing only in names, dates, amount of severance), although some individuals were also given some Demographic Data.

115.   Plaintiff Beauchamp was told that the offer in the Beauchamp Release was not negotiable.

116.   The Beauchamp Agreement does not comply with the OWBPA and is an invalid release of Plaintiff Beauchamp's claims under the ADEA.

117.   Plaintiff Beauchamp signed the Beauchamp Agreement and returned it to Defendant.

118.   At the time of Plaintiff Beauchamp's termination, she had three individuals reporting to her.  Since her termination, her direct reports have been reassigned to

substantially younger individuals reporting to Ms. McDonnell, both of whom were retained after Plaintiff Beauchamp's termination.

119.   After Defendant terminated the two oldest individuals reporting to Ms. McDonnell (Plaintiff Crews (60) and Plaintiff Beauchamp (57)), three substantially younger individuals (Tom Harris (approximately 48), Robyn Label (approximately 46), and Jon Pratt (approximately 45)) began reporting to Ms. McDonnell.

120.   Before the layoffs, the average age of Ms. McDonnell's reports was approximately 49.2 and 40% were over the age of 50.  After the layoffs, the average age of her reports was 44.5 and she had zero reports over the age of 50.

121.   While Plaintiff Beauchamp was terminated, Defendant retained substantially younger employees to perform duties and responsibilities that Plaintiff Beauchamp was qualified and able to perform.

122.   At the time of her termination, Plaintiff Beauchamp was fifty-seven (57) years old.

123.   The reason for Plaintiff Beauchamp's termination as stated by Defendant (*i.e.*, that she was being terminated as part of a "realignment" of Defendant's "staffing needs") is a pretext.

124.   The real reason Plaintiff Beauchamp was terminated was her age.

125.   Plaintiff Beauchamp's age was a determinative and motivating factor in connection with Defendant's decision to terminate her employment.

126.   As a direct result of Defendant's discriminatory conduct, Plaintiff Beauchamp has in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is

not known at this time.

## Plaintiff Ralph Crews

127.    Plaintiff Crews was hired by Defendant as a Senior Vice President in or about March, 2001 and was employed by Defendant for more than nine (9) years before he was laid-off.

128.    In or about 2005, Plaintiff Crews was named the Senior Vice President of Distribution, the position he held until his termination.  Plaintiff Crews also served on the Boards of three of Defendant's subsidiary companies.

129.    As Senior Vice President, Distribution, Plaintiff Crews was responsible for the distribution leadership and strategic planning of three sales channels.

130.    Plaintiff Crews performed his job in a fully satisfactory manner.

131.    Plaintiff Crews was qualified for his position as Senior Vice President of Distribution.

132.    At the time of his termination, Plaintiff Crews reported to Ms. McDonnell, who reported directly to Mr. Chappell.

133.    At the time of his termination, Plaintiff Crews was the oldest of five Vice Presidents and Senior Vice Presidents reporting to Ms. McDonnell.

134.    On November 16, 2009, the two oldest people reporting to Ms. McDonnell were terminated, along with the oldest person reporting to Plaintiff Crews.

135.    On November 16, 2009, Ms. McDonnell and Mr. Clemons informed Mr. Crews that he was being terminated as part of the reduction in force at Defendant's Home Office.

136.    Plaintiff Crews was one of at least three people at the Vice President or higher level, under Ms. McDonnell, who were informed of their termination on November 16, 2009.

137.    Plaintiff Crews was told that his termination had nothing to do with his performance.

138.    The following day, Plaintiff Crews was told again, this time by Mr. Chappell, that his termination had nothing to do with his performance.

139.    Plaintiff Crews was given a letter informing him that his termination was "was not intended to reflect on [him] personally" but was part of a "business decision to realign our staffing needs."

140.    All people terminated on November 16, 2009, were given substantially identical letters (differing only in names and dates), indicating that their termination was part of the same "business decision to realign [Defendant's] staffing needs."

141.    Upon information and belief, all people terminated by Defendant as part of the Layoffs were given substantially identical letters (differing only in names and dates), indicating that their termination was part of the same "business decision to realign [Defendant's] staffing needs."

142.    At the time of his termination, Plaintiff Crews was given a Release, purporting to release Defendant of all claims, including claims under the ADEA, in exchange for severance payment ("Crews Release").

143.    All people terminated on November 16, 2009, were given documents substantially identical to the Crews Release (differing only in names, dates, and amounts of severance.

144.    Upon information and belief, all people terminated by Defendant as part of the Layoffs were given substantially identical Releases (differing only in names, dates, amount of severance), although some individuals were also given some Demographic Data.

145.    The Crews Release does not comply with the OWBPA and is an invalid release of Plaintiff Crews' claims under the ADEA.

146.    Plaintiff Crews signed the Crews Release and returned it to Defendant.

147.    After Defendant terminated the two oldest individuals reporting to Ms. McDonnell (Plaintiff Crews (60) and Plaintiff Beauchamp (57)), three substantially younger individuals (Tom Harris (approximately 48), Robyn Label (approximately 46), and Jon Pratt (approximately 45)) began reporting to Ms. McDonnell.

148.    After his termination, many of Plaintiff Crews' duties and responsibilities were taken over by Tom Harris, Senior Vice President, IFN.

149.    At the time of Plaintiff Crews' termination, Mr. Harris was approximately forty-eight (48) years old.

150.    Mr. Harris was hired in or around August, 2009, less than three months before Plaintiff Crews' was terminated.

151.    Before the Layoffs, the average age of Ms. McDonnell's reports was approximately 49.2 and 40% were over the age of 50.  After the Layoffs, the average age of her reports was 44.5 and she had zero reports over the age of 50.

152.    While Plaintiff Crews was terminated, Defendant retained substantially younger employees to perform duties and responsibilities that Plaintiff Crews was qualified and able to perform.

24

153.   At the time of his termination, Plaintiff Crews was sixty (60) years old.

154.   The reason for Plaintiff Crews' termination as stated by Defendant (*i.e.,* that he was being terminated as part of a "realignment" of Defendant's "staffing needs") is a pretext.

155.   The real reason Plaintiff Crews was terminated was his age.

156.   Plaintiff Crews' age was a determinative and motivating factor in connection with Defendant's decision to terminate his employment.

157.   As a direct result of Defendant's discriminatory conduct, Plaintiff Crews has in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

<u>Plaintiff William Gruccio</u>

158.   Plaintiff Gruccio was hired by Defendant on or about October 1, 1997 and was employed by Defendant for more than twelve (12) years before he was laid-off.

159.   In or about 2005, Plaintiff Gruccio was named Vice President of Career Agency System, one of the sales channels that reported up to Plaintiff Crews.  In or about 2007, Plaintiff Gruccio was promoted to Senior Vice President.

160.   As head of the Career Agency System, Plaintiff Gruccio was responsible for the sales of Defendant's products at its 21 national career distribution offices and was responsible for the recruitment, development, and productivity of the field sales management.

161.   Plaintiff Gruccio performed his job in a fully satisfactory manner.

162.    Plaintiff Gruccio was qualified for his position as Senior Vice President, Career Agency System.

163.    At the time of his termination, Plaintiff Gruccio reported to Plaintiff Crews, who reported directly to Ms. McDonnell.

164.    On November 16, 2009, Ms. McDonnell and Mr. Clemons informed Plaintiff Gruccio that he was being terminated as part of the reduction in force at Defendant's Home Office.

165.    Plaintiff Gruccio was one of at least three people at the Vice President or higher level, under Ms. McDonnell, who were informed of their termination on November 16, 2009.

166.    Plaintiff Gruccio was told that his termination had nothing to do with his performance.

167.    The following day, Plaintiff Gruccio was told again, this time by Mr. Chappell, that his termination had nothing to do with his performance.

168.    Plaintiff Gruccio was given a letter informing him that his termination was "was not intended to reflect on [him] personally" but was part of a "business decision to realign our staffing needs."

169.    All people terminated on November 16, 2009, were given substantially identical letters (differing only in names and dates), indicating that their termination was part of the same "business decision to realign [Defendant's] staffing needs."

170.    Upon information and belief, all people terminated by Defendant as part of the Layoffs were given substantially identical letters (differing only in names and dates),

indicating that their termination was part of the same "business decision to realign [Defendant's] staffing needs."

171.   At the time of his termination, Plaintiff Gruccio was given a Release, purporting to release Defendant of all claims, including claims under the ADEA, in exchange for severance payment ("Gruccio Release").

172.   All people terminated on November 16, 2009, were given documents substantially similar to the Gruccio Release (differing only names, dates, and amounts of severance).

173.   Upon information and belief, all people terminated by Defendant as part of the Layoffs were given substantially identical Releases (differing only in names, dates, amount of severance), although some individuals were also given some Demographic Data.

174.   The Gruccio Release does not comply with the OWBPA and is an invalid release of Plaintiff Gruccio's claims under the ADEA.

175.   Plaintiff Gruccio signed the Gruccio Release and returned it to Defendant.

176.   As of July, 2009, Plaintiff Crews had five direct reports: Plaintiff Gruccio, Dick Ochs (approximately 62), Fred Rackovan (approximately 56), Bayne Northerm (approximately 53), and Mike Williams (approximately 45).

177.   In November, 2009, Mr. Ochs and Mr. Rackovan were terminated as part of the reduction in force.  Defendant presented their terminations to the company as "retirements."  Plaintiff Gruccio was terminated on November 16, 2009.  At the same time, Jonathan Pratt (approximately 45) assumed Plaintiff Gruccio's duties and, in August, 2009, Mr. Harris (approximately 48) was hired.  The net effect is that the three

oldest people reporting to Plaintiff Crews were terminated while a significantly younger individual was hired and another significantly younger individual was promoted.

178.   Plaintiff Crews, despite being Plaintiff Gruccio's supervisor, was not involved in the decision to terminate Plaintiff Gruccio.

179.   After his termination, Plaintiff Gruccio was replaced by Mr. Pratt.

180.   At the time of his termination, Plaintiff Gruccio was sixty (60) years old.

181.   At the time of Plaintiff Gruccio's termination, Mr. Pratt was approximately forty-five (45) years old.

182.   Mr. Pratt had only been hired approximately one year before Plaintiff Gruccio was terminated.  Prior to the termination, Mr. Pratt had reported to Plaintiff Gruccio.

183.   While Plaintiff Gruccio was terminated, Defendant retained substantially younger employees to perform duties and responsibilities that Plaintiff Gruccio was qualified and able to perform.

184.   The reason for Plaintiff Gruccio's termination as stated by Defendant (*i.e.*, that he was being terminated as part of a "realignment" of Defendant's "staffing needs") is a pretext.

185.   The real reason Plaintiff Gruccio was terminated was his age.

186.   Plaintiff Gruccio's age was a determinative and motivating factor in connection with Defendant's decision to terminate his employment.

187.   As a direct result of Defendant's discriminatory conduct, Plaintiff Gruccio has in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this

time.

**COUNT I**
**VIOLATION OF THE ADEA**

188.    Plaintiffs incorporate by reference paragraphs 1 through 187 of this Complaint as if fully set forth herein.

189.    Defendants terminated Plaintiffs, even though they were more experienced and better qualified than substantially younger workers who were retained, promoted, or hired to perform jobs for which Plaintiffs were qualified.

190.    Age was a determinative and motivating factor in the termination of Plaintiffs.

191.    The process by which Defendant conducted the mass layoffs at its Home Office during 2009 and 2010 had a disparate impact on workers aged forty (40) and older.

192.    No workers age forty (40) or older who were terminated as part of the layoffs conducted by Defendant in 2009 and 2010 were given OWBPA-compliant releases; therefore, none released their rights under the ADEA.

193.    All workers age forty (40) or older who were terminated as part of the layoffs conducted by Defendant in 2009 and 2010 are similarly situated to Plaintiffs, as that term is used in the ADEA and the portions of the FLSA incorporated by the ADEA.

194.    Defendant, by the discriminatory acts set forth herein, has violated the ADEA.

195.    Defendant's violations were intentional and willful under the circumstances and warrant the imposition of liquidated damages.

196.   As a direct and proximate result of Defendant's violation of the ADEA, Plaintiffs have sustained the injuries, damages and losses set forth herein.

197.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

## COUNT II
## VIOLATION OF THE OWBPA

198.   Plaintiffs incorporate herein by reference paragraphs 1 through 197 as though set forth in their entirety.

199.   Defendant, by the above described improper and discriminatory acts, has violated the OWBPA.

200.   No workers age forty (40) or older who were terminated as part of the layoffs conducted by Defendant in 2009 and 2010 were given OWBPA-compliant releases; therefore, none released their rights under the ADEA.

201.   All workers age forty (40) or older who were terminated as part of the layoffs conducted by Defendant in 2009 and 2010 and given release agreements by Defendant are similarly situated to Plaintiffs, as that term is used in the ADEA and the portions of the FLSA incorporated by the ADEA.

202.   The Releases given to the Older Workers by Defendant did not constitute a valid release of claims under the ADEA.

203.   As a direct and proximate result of Defendants' violation of the OWBPA, terminated workers over the age of forty (40) have been misled regarding their rights under federal law.

204.   Individuals who signed the Releases, including Named Plaintiffs, did not release their ADEA claims.

205.   In addition to all other damages, Plaintiffs are entitled to declaratory relief, declaring the Releases invalid as to claims arising under the ADEA.

206.   As a direct and proximate result of Defendant's violation of the OWBPA, Plaintiffs have sustained the injuries set forth herein.

207.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the equitable relief requested herein.

208.   Older Workers who were given the fraudulent and invalid Agreements are suffering and will continue to suffer unless and until this Court grants the relief requested herein.

## RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs, Patricia Beauchamp, Ralph Crews, and William Gruccio, and against Defendant, The Penn Mutual Life Insurance Company:

a.   requiring Defendant to provide to the Named Plaintiffs the names, dates of birth, addresses, telephone numbers, dates of termination, and former titles of all individuals who were terminated by Defendant during 2009 and 2010 and who were aged forty (40) or older at the time of their termination;

b.   requiring that notice be given to all individuals who were aged forty (40) and older and terminated by Defendant in 2009 and 2010 as part of group layoff or reduction in force that the General Release was in violation of the OWBPA and does not

prohibit them from bringing age claims under the ADEA against Defendants, and that each such individual has the right to opt in to this litigation as a named Plaintiff without being required to tender back any consideration that they received from Defendant;

c.      declaring the release agreements signed by the Plaintiffs and other individuals aged forty or older who were terminated in 2009 and 2010 to be in violation of the OWBPA and invalid as to claims under the ADEA;

d.      Ordering that this action shall proceed as a collective action to include all individuals who were aged forty (40) and older and terminated by Defendant in 2009 and 2010 as part of group layoff or reduction in force that choose to opt in pursuant to a process approved by the Court;

e.      declaring the acts and practices complained of herein to be a violation of the ADEA;

f.      declaring the acts and practices complained of herein to be a violation of the OWBPA;

g.      enjoining and restraining permanently the violations alleged herein;

h.      awarding compensatory damages to Plaintiffs to make Plaintiffs whole for all past and future lost earnings, benefits and earnings capacity which Plaintiffs have suffered and will continue to suffer as a result of Defendant's discriminatory conduct;

i.      awarding liquidated damages to Plaintiffs;

j.      awarding Plaintiffs the costs of this action, together with reasonable attorney's fees;

k.      awarding Plaintiffs such other damages as are appropriate under the ADEA, as amended by the OWBPA; and,

I.    granting such other and further relief as this Court deems appropriate.


**CONSOLE LAW OFFICES LLC**

Dated: December 9, 2010          BY:      s/ CAROL A. MAGER
                                          Carol A. Mager
                                          Stephen G. Console
                                          James M. Duttera
                                          1525 Locust St., 9th Floor
                                          Philadelphia, PA 19102
                                          (856) 854-4000
                                          (856) 854-4006 (fax)
                                          mager@consolelaw.com
                                          console@consolelaw.com
                                          duttera@consolelaw.com

                                          Attorneys for Plaintiffs,
                                          Patricia Beauchamp
                                          Ralph Crews
                                          William Gruccio

EXHIBIT "A"

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| Q   FEPA | |
| x    EEOC | 530-2010-02160 |

STATE OR LOCAL AGENCY:

| NAME (Indicate Mr., Ms., Mrs.) **Ms. Patricia Beauchamp** | HOME TELEPHONE NUMBER *(Include Area Code)* |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP **Norristown, PA 19403** | DATE OF BIRTH |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME **The Penn Mutual Life Insurance Company** | NUMBER OF EMPLOYEES, MEMBERS **Greater than 1,000** | TELEPHONE (Include Area Code) **(215) 956-8000** |
|---|---|---|

| STREET ADDRESS **600 Dresher Rd.** | CITY, STATE AND ZIP **Horsham, PA 19044** | COUNTY **Montgomery** |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))* <br> Q  Race    Q  Color    Q  Sex    Q  Religion    Q  National Origin <br> Q  Retaliation    x  Age    Q  Disability    Q  Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE **11/16/09** <br> *Earliest*                    *Latest* <br> Q  Continuing Violation |
|---|---|

THE PARTICULARS ARE:

**A.    1.    Relevant Work History**

I was hired by Respondent, The Penn Mutual Life Insurance Company, on or about July 31, 1995. At the time of my wrongful termination in November, 2009, I had more than fourteen (14) years of successful performance with the Respondent.  I had more than 12 years at the Vice President or higher level with Respondent and I had been a member of the Executive team for approximately 10 years.

From August, 1997 to my termination, I was the Vice President, Corporate Communications.  At the time of my termination, I was responsible for the strategies and tactics surrounding the company's internal and external communications, public relations, trade advertising, website development, incentive conferences and recognition programs, and meeting management.

At the time of my termination, I was 57 years old.  I reported to Eileen McDonnell, Executive Vice President & Chief Marketing Officer (47*).  I was the second oldest of five Vice Presidents and Senior Vice Presidents reporting to Ms. McDonnell.  On November 16, 2009, the two oldest people reporting to Ms. McDonnell, myself and Ralph Crews, Senior Vice President, Distribution (60), were terminated.  I was the only person from the Corporate Communications department who was let go at that time.

\* - Most ages herein are approximates only.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements) <br> I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
|---|---|

| I declare under penalty of perjury that the foregoing is true and correct. <br><br> Date: 5/4/10        Charging Party (Signature) <br> *Patricia Beauchamp* | SIGNATURE OF COMPLAINANT <br><br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day Month, and year) |
|---|---|

EEOC Charge of Discrimination
Patricia Beauchamp v. The Penn Mutual Life Insurance Company
Page 2 of 5

2.      **Statement of Harm**

Throughout 2009, Respondent was in the process of conducting a reduction in force at its Horsham headquarters. As a member of the executive team, I was present at meetings where target staffing goals, and number of persons to be terminated were discussed. In general, the stated goal was to reduce the number of full-time employees at headquarters from approximately 600 to 530 (a reduction of approximately 12%). These reductions occurred in waves throughout 2009. On November 16, 2009, I was told that I was being terminated, effective immediately. At least two other individuals from Ms. McDonnell's department – Mr. Crews (60) and William Gruccio, Senior Vice President of Sales, Career Distribution (60) – were also informed of their terminations on the same day. We were terminated because of our ages.

On November 16, 2009, at the time I was advised of my termination, Respondent violated the Older Workers' Benefit Protection Act ("OWBPA") by offering me, and other terminated older workers, severance in exchange for the execution of a "Severance Of Employment Agreement and General Release" (the "Release") which fraudulently purported to release all claims against Respondent, including federal age discrimination claims, but which failed to comply with the OWBPA's requirements. I signed and returned the Release to Respondent on December 14, 2009. However, the purported waiver of my ADEA claims is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

**B.      Respondents' Stated Reasons**

Ms. McDonnell and Ed Clemons, Senior Vice President, Human Resources, told me that I was being terminated as part of Respondent's general reduction in force of the home office. I was explicitly told that my selection for termination was not performance based.

Respondent has not provided any reason for its violation of the OWBPA.

**C.     Rationale/Basis for Allegations of Discrimination and Statutes Covered**

I allege that Respondent has discriminated against me based on my age (then 57) in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. 621, et seq. ("ADEA") and the Older Workers Benefit Protection Act, 29 U.S. C. § 626(f) ("OWBPA").

Evidence of discrimination includes, but is not limited to (in addition to what is set forth herein):

1.      Respondent induced me and other older workers to sign a Release that was in violation of the OWBPA. The Release fraudulently purported to release all claims against Respondent - explicitly including federal age discrimination claims under the ADEA - but failed to comply with the requirements of the OWBPA, including those applicable to group layoffs such as this, and was neither knowing or voluntary. Without limitation:

**EEOC Charge of Discrimination**
**Patricia Beauchamp v. The Penn Mutual Life Insurance Company**
**Page 3 of 5**

a.      Respondent did not properly identify the eligibility factors or criteria used to determine which employees would be separated from the company.

b.      Respondent did not properly identify the decisional unit considered for termination.

c.      Respondent failed to provide any information, as required by the OWBPA, regarding the ages and positions of all individuals retained or terminated as part of the group layoff.

d.      Respondent intentionally conducted the layoff in waves over a period of time, concealing the true extent of the layoffs and denying the laid-off employees access to complete lists of the ages and titles of all employees terminated and retained.

e.      The Release provides only twenty-one (21) days to review and sign it, rather than the forty-five (45) days to review and sign it that are required by the OWBPA to be given in cases of group layoffs.

f.      To the extent that the Release purports to preclude me from filing a charge of discrimination with the EEOC, it is unlawful.

2.      Respondent was aware that the Release presented to me and certain other older individuals did not comply with the OWBPA because other terminated individuals did in fact receive information with ages and positions of some people who were terminated or retained.

3.      My performance at all times had been excellent and did not warrant termination. In fact, I have been told that my performance had nothing to do with my termination.

4.      The downsizing/reduction in force process had a disparate impact on older workers. In fact, at one particular meeting during the summer of 2009, Ms. McDonnell remarked that the layoffs included a large percentage of older workers. Mr. Clemons responded with words to the effect that the numbers were "within the acceptable limits."

5.      The pattern of layoffs demonstrates an intent to terminate older workers and retain younger workers. By way of example:

a.      As of the summer of 2009, Ms. McDonnell had five direct reports: Ralph Crews (60), myself (57), Mark Wutt (46), Denise Flannery (46), and Michelle Barry (37). On November 16, 2009, the two oldest of these reports – Mr. Crews and myself – were terminated while all of the younger workers were retained. After the terminations, Tom Harris (48), Robyn Label (46), and Jon Pratt (45) all began reporting to Ms. McDonnell.

EEOC Charge of Discrimination
Patricia Beauchamp v. The Penn Mutual Life Insurance Company
Page 4 of 5

   b.      Bill Gruccio, who was also terminated on November 16, 2009, was the oldest person reporting to Mr. Crews.  At the beginning of the summer of 2009, Mr. Crews has six direct reports: Dick Ochs (62), Bill Gruccio (60), Fred Rackovan (56), Bayne Northern (53), and Mike Williams (44).   During 2009, the four oldest individuals – Mr. Crews, Mr. Ochs, Mr. Gruccio, and Mr. Rackovan – were all selected for termination as part of the downsizing.

   6.      My duties were taken over by two substantially younger workers who were less qualified, less experienced, and had less time with Respondent than me.  One of my direct reports was assigned to Michelle Barry (37) while my other two direct reports were assigned to Denise Flannery (46).

   7.      Mr. Crews and Mr. Gruccio were also replaced by younger workers.  Upon information and belief, Mr. Crews was replaced by Tom Harris (48) who had been hired by Respondent only three months earlier.  Mr. Gruccio was replaced by Jon Pratt (45) who had been hired only a year earlier.

   8.      Respondent has a corporate culture of age bias.  By way of example, Respondent is very concerned about always having a "ramp" of younger workers to replace older workers.  By way of further example, during 2009, Mr. Crews was instructed by Ms. McDonnell to work with several older field managers within his distribution system to reach agreements that would ensure that they would not attempt to remain employed with Respondent past the age of 66 and that they would train their younger replacements.

   9.      The highest levels of Respondent's management have made direct explicit comments that age was a factor in the layoff decisions.  By way of example, within approximately two weeks of the terminations of me, Mr. Gruccio, and Mr. Crews, the Chairman and CEO of Respondent, Robert Chappell, in response to a question from a producer about Mr. Gruccio's termination, stated that the company wanted to "go younger" with its leadership team (which included me, Mr. Gruccio, and Mr. Crews).

   10.      Upon information and belief, the reduction in force had a disparate impact on older workers.  Between July and December of 2009, Respondent laid-off approximately 50 workers as part of its alleged downsizing/cost-saving measures.  Of these, approximately 38 were age forty or over.

**D.  Class Charge**

   I allege that Respondent has engaged in a pattern and practice of discriminating against older individuals in violation of the ADEA.   In that regard, I bring this charge as a class and pattern and practice charge on behalf of myself and any and all current or former employees, and applicants, age forty and over who have been adversely affected by Respondent's discriminatory practices (as a result of disparate treatment or disparate impact) in connection with hiring decisions, promotions, or terminations.

**EEOC Charge of Discrimination**
**Patricia Beauchamp v. The Penn Mutual Life Insurance Company**
**Page 5 of 5**

I further allege that Respondent has violated the ADEA, as amended by the OWBPA, and that the language, terms and manner of presentation of Respondent's release agreements utilized during the reduction in force/downsizing that occurred in 2009 and 2010 is part of a pattern and practice to adversely treat and disparately impact me and similarly situated employees age forty (40) and over, and was a scheme in violation of the ADEA and the OWBPA with the intention of deceiving me and others into believing that we could not sign the release, collect severance and bring an age discrimination case against Respondent. **In that regard, I bring this charge as a class charge on behalf of those individuals age forty (40) and over whom Respondent terminated as part of the reduction in force/downsizing during 2009 and 2010 and who were presented with and signed a "Severance Of Employment Agreement and General Release" which purported to be a general release of all claims, including federal age claims, but which failed to comply with the OWBPA.**

# EXHIBIT "B"

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | ☐ FEPA<br>x  EEOC | *530-2010-01882* |

STATE OR LOCAL AGENCY:

| NAME (Indicate Mr., Ms., Mrs.)<br>**Mr. Ralph Crews** | HOME TELEPHONE NUMBER *(Include Area Code)* |
|---|---|

| STREET ADDRESS �altered | CITY, STATE AND ZIP<br>**Doylestown, PA 18901** | DATE OF BIRTH |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>**The Penn Mutual Life Insurance Company** | NUMBER OF EMPLOYEES, MEMBERS<br>**Greater than 1,000** | TELEPHONE (Include Area Code)<br>**(215) 956-8000** |
|---|---|---|

| STREET ADDRESS<br>**600 Dresher Rd.** | CITY, STATE AND ZIP<br>**Horsham, PA 19044** | COUNTY<br>**Montgomery** |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>☐ Race  ☐ Color  ☐ Sex  ☐ Religion  ☐ National Origin<br>☐ Retaliation  x Age  ☐ Disability  ☐ Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>11/16/09<br>*Earliest*          *Latest*<br>☐ Continuing Violation |
|---|---|

THE PARTICULARS ARE:

**A.   1.   Relevant Work History**

   I was hired by Respondent, The Penn Mutual Life Insurance Company, on or about March 1, 2001. At the time of my wrongful termination in November, 2009, I had over thirty-five (35) years of successful sales and marketing leadership experience, and eighteen years of success as an executive/senior officer at two different life insurance companies.  I had nine years at the Vice President or higher level with Prudential Insurance (including three years as a Senior Vice President) before becoming employed by Respondent.

   I was a Senior Vice President with Respondent for eight years prior to my termination.  From 2005 to my termination, I was the Senior Vice President, Distribution.  During that time, I generated consistent and sustained sales growth.  At the time of my termination, I was responsible for the distribution leadership and strategic planning of three channels, totaling more than $77.4 million of annual life premiums, $911 million of annuities, and $1.0 billion of Broker Dealer sales.  I also served on the Board of Directors of three of Respondent's subsidiary companies.

   At the time of my termination, I was 60 years old.  I reported to Eileen McDonnell, Executive Vice President & Chief Marketing Officer (47*).  I was the oldest of five Vice Presidents and Senior Vice Presidents reporting to Ms. McDonnell.
* - Most ages herein are approximates only.

| ___I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements)<br><br>I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
|---|---|
| I declare under penalty or perjury that the foregoing is true and correct. | |
| Date: 3/16/10    Charging Party (Signature)  *Ralph L. Crews* | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |

EEOC Charge of Discrimination
Ralph Crews v. The Penn Mutual Life Insurance Company
Page 2 of 5

2.      **Statement of Harm**

Throughout 2009, Respondent was in the process of conducting a reduction in force at its Horsham headquarters. Ms. McDonnell has stated that the goal was to reduce the number of full-time employees at headquarters from approximately 600 to 530 (a reduction of approximately 12%). These reductions occurred in waves throughout 2009. On November 16, 2009, I was told that I was being terminated, with my last day of employment to be January 31, 2010. At least two other individuals from Ms. McDonnell's department – William Gruccio, Senior Vice President of Sales, Career Distribution (60) and Pat Beauchamp, Vice President, Corporate Communications (57) – were also informed of their terminations on the same day. We were terminated because of our ages.

On November 16, 2009, at the time I was advised of my termination, Respondent violated the Older Workers' Benefit Protection Act ("OWBPA") by offering me, and other terminated older workers, severance in exchange for the execution of a "Severance Of Employment Agreement and General Release" (the "Release") which fraudulently purported to release all claims against Respondent, including federal age discrimination claims, but which failed to comply with the OWBPA's requirements. I signed and returned the Release to Respondent on December 16, 2009. However, the purported waiver of my ADEA claims is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

**B.      Respondents' Stated Reasons**

Ms. McDonnell and Ed Clemons, Senior Vice President, Human Resources, told me that I was being terminated as part of Respondent's general reduction in force of the home office. I was explicitly told that my selection for termination was not performance based. On November 17, 2009, I was told the same things in a private meeting with Robert Chappell, Respondent's Chairman, President, and Chief Executive Officer.

Respondent has not provided any reason for its violation of the OWBPA.

**C.      Rationale/Basis for Allegations of Discrimination and Statutes Covered**

I allege that Respondents have discriminated against me based on my age (then 60) in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. 621, *et seq.* ("ADEA") and the Older Workers Benefit Protection Act, 29 U.S. C. § 626(f) ("OWBPA").

Evidence of discrimination includes, but is not limited to (in addition to what is set forth herein):

1.      Respondent induced me and other older workers to sign a Release that was in violation of the OWBPA. The Release fraudulently purported to release all claims against Respondent - explicitly including federal age discrimination claims under the ADEA - but failed to comply with the requirements of the OWBPA, including those applicable to group layoffs

EEOC Charge of Discrimination
Ralph Crews v. The Penn Mutual Life Insurance Company
Page 3 of 5

such as this, and was neither knowing or voluntary.  Without limitation:

      a.      Respondent did not properly identify the eligibility factors or criteria used to determine which employees would be separated from the company.

      b.      Respondent did not properly identify the decisional unit considered for termination.

      c.      Respondent failed to provide any information, as required by the OWBPA, regarding the ages and positions of all individuals retained or terminated as part of the group layoff.

      d.      Respondent intentionally conducted the layoff in waves over a period of time, concealing the true extent of the layoffs and denying the laid-off employees access to complete lists of the ages and titles of all employees terminated and retained.

      e.      The Release provides only twenty-one (21) days to review and sign it, rather than the forty-five (45) days to review and sign it that are required by the OWBPA to be given in cases of group layoffs.

      f.      To the extent that the Release purports to preclude me from filing a charge of discrimination with the EEOC, it is unlawful.

2.      My performance at all times had been excellent and did not warrant termination. In fact, I have been told that my performance had nothing to do with my termination.

3.      The downsizing/reduction in force process had a disparate impact on older workers.

4.      The pattern of layoffs demonstrates an intent to terminate older workers and retain younger workers.  By way of example:

      a.      As of the summer of 2009, Ms. McDonnell had five direct reports: myself (60), Pat Beauchamp (57), Mark Wutt (46), Denise Flannery (46), and Michelle Barry (37).  On November 16, 2009, the two oldest of these reports – Ms. Beauchamp and myself – were terminated while all of the younger workers were retained.  After the terminations, Tom Harris (48), Robyn Label (46), and Jon Pratt (45) all began reporting to Ms. McDonnell.

      b.      I began the summer of 2009 with six direct reports: Dick Ochs (62), Bill Gruccio (60), Fred Racovan (56), Bayne Northern (53), and Mike Williams (44). During 2009, the four oldest individuals – myself, Mr. Ochs, Mr. Gruccio, and Mr. Racovan – were all selected for termination as part of the downsizing.

EEOC Charge of Discrimination
Ralph Crews v. The Penn Mutual Life Insurance Company
Page 4 of 5

5.     I was replaced by substantially younger workers who were less qualified, less experienced, and had less time with Respondent than me.  Specifically, I was replaced by Tom Harris (48), who had been hired only three months before my termination.  Robyn Label (46), who had begun reporting to me less than two months earlier, began reporting directly to Ms. McDonnell.

6.     Mr. Gruccio, who was terminated at the same time as I, was also replaced by a substantially younger worker who was less qualified, less experienced, and had less time with Respondent.  He was replaced by Jon Pratt (45), who had been hired only a year earlier and had, in fact, reported to Mr. Gruccio.  After the terminations, Mr. Pratt took over Mr. Gruccio's duties and responsibilities and began reporting to Ms. McDonnell.

7.     Respondent has a corporate culture of age bias.  By way of example, Respondent is very concerned about always having a "ramp" of younger workers to replace older workers.  By way of further example, during 2009, I was instructed by Ms. McDonnell to work with several older field managers within my distribution system to reach agreements that would ensure that they would not attempt to remain employed with Respondent past the age of 66 and that they would train their younger replacements.

8.     In the years prior to my termination, Respondent failed to select me for promotions because of my age, instead, hiring younger, less qualified or less experienced applicants.  For example, in 2005, I applied and was interviewed for the position of Chief Marketing Officer.  Dick Miller, who was approximately ten years younger than I, was selected for the position.  In 2007, Mr. Miller was terminated.  Between July, 2007 and February, 2008, Respondent searched for his replacement.  Again, I applied for the position, but was passed over in favor of a younger candidate, this time Ms. McDonnell, approximately thirteen years younger than I.

9.     The highest levels of Respondent's management have made direct explicit comments that age was a factor in the layoff decisions.  By way of example, within approximately two weeks of the terminations of me, Mr. Gruccio, and Ms. Beauchamp, the Chairman and CEO of Respondent, Mr. Chappell, in response to a question from a producer about Mr. Gruccio's termination, stated that the company wanted to "go younger" with its leadership team (which included me, Mr. Gruccio, and Ms. Beauchamp).

10.     Upon information and belief, the reduction in force had a disparate impact on older workers.  Between July and December of 2009, Respondent laid-off approximately 50 workers as part of its alleged downsizing/cost-saving measures.  Of these, approximately 38 were age forty or over.

D.     Class Charge

I allege that Respondent has engaged in a pattern and practice of discriminating against older individuals in violation of the ADEA.  In that regard, I bring this charge as a class and

EEOC Charge of Discrimination
Ralph Crews v. The Penn Mutual Life Insurance Company
Page 5 of 5

pattern and practice charge on behalf of myself and any and all current or former employees, and applicants, age forty and over who have been adversely affected by Respondent's discriminatory practices (as a result of disparate treatment or disparate impact) in connection with hiring decisions, promotions, or terminations.

I further allege that Respondents have violated the ADEA, as amended by the OWBPA, and that that the language, terms and manner of presentation of Respondent's release agreements utilized during the reduction in force/downsizing that occurred in 2009 and 2010 is part of a pattern and practice to adversely treat and disparately impact me and similarly situated employees age forty (40) and over, and was a scheme in violation of the ADEA and the OWBPA with the intention of deceiving me and others into believing that we could not sign the release, collect severance and bring an age discrimination case against Respondent. **In that regard, I bring this charge as a class charge on behalf of those individuals age forty (40) and over whom Respondent terminated as part of the reduction in force/downsizing during 2009 and 2010 and who were presented with and signed a "Severance Of Employment Agreement and General Release" which purported to be a general release of all claims, including federal age claims, but which failed to comply with the OWBPA.**

EXHIBIT "C"

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | ☐ FEPA<br>x  EEOC | 530-2010-01765 |

| STATE OR LOCAL AGENCY: |
|---|

| NAME (Indicate Mr., Ms., Mrs.)<br>**Mr. William Gruccio** | HOME TELEPHONE NUMBER *(Include Area Code)* |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP<br>**Doylestown, PA 18902** | DATE OF BIRTH |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>**The Penn Mutual Life Insurance Company** | NUMBER OF EMPLOYEES, MEMBERS<br>**Greater than 1,000** | TELEPHONE (Include Area Code)<br>**(215) 956-8000** |
|---|---|---|

| STREET ADDRESS<br>**600 Dresher Rd.** | CITY, STATE AND ZIP<br>**Horsham, PA 19044** | COUNTY<br>**Montgomery** |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>☐ Race  ☐ Color  ☐ Sex  ☐ Religion  ☐ National Origin<br>☐ Retaliation   x Age  ☐ Disability  ☐ Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>11/16/09<br>*Earliest*                *Latest*<br>☐ Continuing Violation |
|---|---|

THE PARTICULARS ARE:

A.   1.   **Relevant Work History**

I was hired by Respondent, The Penn Mutual Life Insurance Company, on or about October 1, 1997. At the time of my wrongful termination in November, 2009, I had over thirty-five years of experience in the insurance industry. I had extensive management experience prior to joining Respondent, and entered Respondent's company at a Regional Vice President level.

In 2005, I was promoted to Vice President of Sales, Career Agency System. In 2007, I was promoted again to Senior Vice President, Career Agency System. From 2005 to my termination, I was responsible for the sales of Respondent's products at its 21 national career distribution offices. I was responsible for the recruitment, development, and productivity of the field sales management and was involved in the development and execution of strategic and tactical plans and serve as part of Respondent's leadership team.

At the time of my termination, I was 60 years old. I reported to Ralph Crews, Senior Vice President, Distribution (60*). Mr. Crews was terminated at the same time that I was. As of the summer of 2009, I was one of five people reporting directly to Mr. Crews. By the end of 2009, the three oldest (including myself) and Mr. Crews had all been let go as part of a reduction in force/downsizing.

* - Most ages herein are approximates only.

| ___I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements)<br><br>I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief |
|---|---|
| I declare under penalty or perjury that the foregoing is true and correct. | |
| Date:<br>3/16/10          Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |

EEOC Charge of Discrimination
William Gruccio v. The Penn Mutual Life Insurance Company
Page 2 of 5

2.      Statement of Harm

Throughout 2009, Respondent was in the process of conducting a reduction in force at its Horsham headquarters.  Eileen McDonnell, Executive Vice President & Chief Marketing Officer (47), has stated that the goal was to reduce the number of employees at headquarters from approximately 600 to 530 (a reduction of approximately 12%).  These reductions occurred in waves throughout 2009.  On November 16, 2009, I was told that I was being terminated, with my last day of employment to be January 31, 2010.  At least two other individuals from Ms. McDonnell's department – my supervisor, Ralph Crews (60) and Pat Beauchamp, Vice President, Corporate Communications (57) – were also informed of their terminations on the same day.  We were terminated because of our ages.

On November 16, 2009, at the time I was advised of my termination, Respondent violated the Older Workers' Benefit Protection Act ("OWBPA") by offering me, and other terminated older workers, severance in exchange for the execution of a "Severance Of Employment Agreement and General Release" (the "Release") which fraudulently purported to release all claims against Respondent, including federal age discrimination claims, but which failed to comply with the OWBPA's requirements.  I signed and returned the Release to Respondent on or about December 14, 2009.  However, the purported waiver of my ADEA claims is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

B.      Respondents' Stated Reasons

Ms. McDonnell and Ed Clemons, Senior Vice President, Human Resources, told me that I was being terminated as part of Respondent's general cuts at the home office.  On November 17, 2009, Robert Chappell, Respondent's Chairman, President, and Chief Operating Officer, also told me that my termination was because of the downsizing at the home office and not because of my performance.  Mr. Chappell later told another individual that Respondent wanted to "go younger" with its leadership team.

Respondent has not provided any reason for its violation of the OWBPA.

C.      Rationale/Basis for Allegations of Discrimination and Statutes Covered

I allege that Respondents have discriminated against me based on my age (then 60) in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. 621, *et seq.* ("ADEA") and the Older Workers Benefit Protection Act, 29 U.S. C. § 626(f) ("OWBPA").

Evidence of discrimination includes, but is not limited to (in addition to what is set forth herein):

1.      Respondent induced me and other older workers to sign a Release that was in violation of the OWBPA.  The Release fraudulently purported to release all claims against Respondent - explicitly including federal age discrimination claims under the ADEA - but failed

to comply with the requirements of the OWBPA, including those applicable to group layoffs such as this, and was neither knowing or voluntary.  Without limitation:

      a.      Respondent did not properly identify the eligibility factors or criteria used to determine which employees would be separated from the company.

      b.      Respondent did not properly identify the decisional unit considered for termination.

      c.      Respondent failed to provide any information, as required by the OWBPA, regarding the ages and positions of all individuals retained or terminated as part of the group layoff.

      d.      Respondent intentionally conducted the layoff in waves over a period of time, concealing the true extent of the layoffs and denying the laid-off employees access to complete lists of the ages and titles of all employees terminated and retained.

      e.      The Release provides only twenty-one (21) days to review and sign it, rather than the forty-five (45) days to review and sign it that are required by the OWBPA to be given in cases of group layoffs.

      f.      To the extent that the Release purports to preclude me from filing a charge of discrimination with the EEOC, it is unlawful.

2.      My performance at all times had been excellent and did not warrant termination. In fact, I have been told that my performance had nothing to do with my termination.

3.      The downsizing/reduction in force process had a disparate impact on older workers.

4.      The pattern of layoffs demonstrates an intent to terminate older workers and retain younger workers.  By way of example:

      a.      As of the summer of 2009, Ms. McDonnell had five direct reports: Ralph Crews (60), Pat Beauchamp (57), Mark Wutt (46), Denise Flannery (46), and Michelle Barry (37).  On November 16, 2009, the two oldest of these reports – Mr. Crews and Ms. Beauchamp – were terminated while all of the younger workers were retained.  After the terminations, Tom Harris (48), Robyn Label (46), and Jon Pratt (45) (who replaced me) all began reporting to Ms. McDonnell.

      b.      Prior to the layoffs, I was one of five people reporting to Mr. Crews: Dick Ochs (62), myself (60), Fred Racovan (56), Bayne Northern (53), and Mike Williams (44).  During 2009, the three oldest individuals – myself, Mr. Ochs, and

EEOC Charge of Discrimination
William Gruccio v. The Penn Mutual Life Insurance Company
Page 5 of 5

I further allege that Respondents have violated the ADEA, as amended by the OWBPA, and that that the language, terms and manner of presentation of Respondent's release agreements utilized during the reduction in force/downsizing that occurred in 2009 and 2010 is part of a pattern and practice to adversely treat and disparately impact me and similarly situated employees age forty (40) and over, and was a scheme in violation of the ADEA and the OWBPA with the intention of deceiving me and others into believing that we could not sign the release, collect severance and bring an age discrimination case against Respondent. **In that regard, I bring this charge as a class charge on behalf of those individuals age forty (40) and over whom Respondent terminated as part of the reduction in force/downsizing during 2009 and 2010 and who were presented with and signed a "Severance Of Employment Agreement and General Release" which purported to be a general release of all claims, including federal age claims, but which failed to comply with the OWBPA.**