IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA BEAUCHAMP, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 10-7170 |
| | : | |
| THE PENN MUTUAL LIFE INSURANCE COMPANY | : : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                       **July 29, 2011**

      Plaintiffs Patricia Beauchamp, Ralph Crews, and William Gruccio bring claims against The Penn Mutual Life Insurance Company (Penn Mutual), their former employer, pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Older Workers Benefit Protection Act (OWBPA), 29 U.S.C. § 626(f). Plaintiffs seek to pursue these claims as a collective action on behalf of themselves and all other former Penn Mutual employees age 40 and older who were terminated between May 22, 2009, and December 31, 2010, as part of an alleged reduction in force at Penn Mutual's headquarters (the home office) in Horsham, Pennsylvania. To that end, Plaintiffs ask this Court to conditionally certify the collective action and to facilitate notice of the action to potential opt-in plaintiffs. For the reasons set forth below, the motion for conditional certification will be granted.

**FACTS**[1]

---

[1] To prevail on a motion for conditional certification, a plaintiff must make a "modest factual showing" that the proposed collective action members are similarly situated. *Harris v. Healthcare Servs. Grp.*, No. 06-2903, 2007 U.S. Dist. LEXIS 55221, at *9 (E.D. Pa. July 31, 2007). The following facts are thus drawn from Plaintiffs' affidavits, portions of which Penn Mutual has moved to strike, and the accompanying exhibits. By separate order, this Court partially granted Penn Mutual's motion to strike portions of Plaintiffs' affidavits. The stricken portions of the affidavits and the portions of the affidavits on which Plaintiffs have disclaimed reliance for purposes of this motion will not be considered.

Plaintiffs are former high-ranking employees of Penn Mutual who were terminated in November 2009 at the ages of 57 (Beauchamp) and 60 (Crews and Gruccio). At the time of their terminations, Beauchamp held the position of Vice President of Corporate Communications, and Crews and Gruccio were both Senior Vice Presidents in Penn Mutual's Sales and Marketing department. All three Plaintiffs worked out of the company's home office and reported, directly or indirectly, to Penn Mutual's then-Executive Vice President and Chief Marketing Officer Eileen McDonnell.[2] McDonnell, in turn, reported to Robert Chappell, who was then Penn Mutual's President, Chief Executive Officer, and Chairman.

On November 16, 2009, McDonnell and Ed Clemons, Penn Mutual's Senior Vice President of Human Resources, informed Plaintiffs they were being terminated as part of ongoing waves of terminations at the home office. Beauchamp and Crews were the oldest of five employees who reported directly to McDonnell. Gruccio was one of the three oldest employees reporting to Crews, all of whom were terminated in November 2009.[3] After Plaintiffs were terminated, three substantially younger individuals began reporting to McDonnell, and many of Crews's and Gruccio's duties were taken over by significantly younger individuals.

Plaintiffs contend their terminations were part of a reduction in force Penn Mutual undertook in 2009 and 2010 to meet Chappell's goal of reducing personnel costs at the home office to 2007 levels by, *inter alia*, terminating between 50 and 100 home office employees. Although the layoffs occurred in waves during the second half of 2009 and into 2010, Beauchamp states such layoffs were

---

[2] McDonnell was subsequently named President of Penn Mutual effective May 2010, and Chief Executive Officer effective February 2011. McDonnell Decl. ¶ 1.

[3] Crews asserts he was not involved in the decision to terminate Gruccio.

2

discussed and centrally planned in 2009 at weekly meetings of Penn Mutual's "Executive Team," of which Beauchamp was a member. According to Beauchamp, Clemons presided over discussions regarding the layoffs at the weekly meetings, which were run by Chappell, and members Penn Mutual's upper management reviewed the individuals selected for termination regardless of the individual's department. Beauchamp also states that an evolving list of terminations or planned terminations from all departments was centrally maintained and circulated at the weekly meetings. This list, the September 2009 version of which is attached to Beauchamp's Affidavit, identifies the individuals who had been terminated or selected for termination as of a particular date, along with their actual or prospective termination dates and other information, including their ages.

When Plaintiffs were notified they were being terminated, each received a letter signed by McDonnell advising that his or her position was being eliminated as part of a "business decision to realign [Penn Mutual's] staffing needs." Crews Aff. Ex. B; Gruccio Aff. Ex. B; *see also* Beauchamp Aff. ¶ 21 (stating Beauchamp's termination letter was substantially the same as Crews's and Gruccio's letters). Each Plaintiff also received a uniform "Severance of Employment Agreement and General Release" prepared by Chappell, which purported to release all claims against Penn Mutual, including ADEA claims. Plaintiffs contend these releases were illegal insofar as they purported to release ADEA claims because they failed to comply with the OWBPA.[4] Notably, Penn Mutual has indicated it will not seek to enforce the three named Plaintiffs' purported release of their ADEA claims.

Plaintiffs allege these layoffs "were designed to, and did, discriminatorily remove older

---

[4] The OWBPA requires any waiver of claims under the ADEA to be knowing and voluntary and sets forth certain requirements a waiver must meet in order to be considered knowing and voluntary. *See* 29 U.S.C. § 626(f).

3

workers from employment with [Penn Mutual]," Compl. ¶ 1, and assert Penn Mutual's decisionmaking process was infected by the company's culture of age discrimination. Beauchamp states the Executive Team meetings at which the layoffs were discussed "included frequent discussions of 'succession planning' and 'pipelines' to ensure [there would be] employees to replace older workers who would be eliminated or assumed to retire," with such "pipeline" employees being "almost invariably, significantly younger." Beauchamp Aff. ¶ 14. According to Crews and Gruccio, moreover, Penn Mutual executives openly discussed the need to create promotional opportunities for younger workers, which opportunities would not be presented if older workers did not "move on." Crews Aff. ¶ 13; Gruccio Aff. ¶ 12. Executives also made comments indicating a desire to hire people "born after the Eisenhower administration" and people who would "have the energy" to be around Penn Mutual for the next 15 to 20 years. Crews Aff. ¶ 8; Gruccio Aff. ¶ 7. Plaintiffs further assert Penn Mutual created a culture in which decision makers knew to consider an employee's "ramp"—*i.e.*, how much younger an employee is than the employee he or she is anticipated to replace—when making employment decisions.[5] Crews Aff. ¶ 8; Gruccio Aff. ¶ 7.

Although Penn Mutual agrees the company "undertook Home Office expense reduction efforts in 2009," including employee terminations, Penn Mutual disputes Plaintiffs' characterization of the manner in which the terminations were implemented. Def.'s Opp'n to Mot. to Proceed as Collective Action 1, 13. In particular, Penn Mutual disputes that the terminations were centrally

---

[5] In further support of their claims of pervasive age bias, Crews and Gruccio state members of Penn Mutual's management have referred to the company's older field managers as "retired on active duty," which Crews and Gruccio assert reflects their assumption that older employees would be less productive than younger employees. Crews Aff. ¶ 11; Gruccio Aff. ¶ 10. In addition, after being advised that it would be illegal to institute a mandatory retirement age for field managers, Penn Mutual obtained agreements from older field managers to retire at a certain age in exchange for additional compensation. Crews Aff. ¶ 12; Gruccio Aff. ¶ 11.

planned and coordinated, and denies age was a factor in any of its termination decisions. Penn Mutual instead contends all of its expense reduction decisions were made by different business units operating independently and employment terminations decisions were made at different times using different criteria, without the involvement of the company's Executive Team. While Penn Mutual acknowledges its Executive Team had discussions regarding the terminations, Penn Mutual contends these discussions were "typically limited to the business or operational impact of the decisions," McDonnell Decl. ¶ 15; *see also* Clemons Decl. ¶ 13; O'Malley Decl. ¶ 20, and the Executive Team did not participate in the decision making process. In support of this position, Penn Mutual has submitted affidavits from several business unit leaders and their direct reports describing the manner in which the business unit implemented its expense reduction efforts.

**DISCUSSION**

The ADEA, by incorporating § 16(b) of the Fair Labor Standards Act (FLSA), "expressly authorizes employees to bring collective age discrimination actions 'in behalf of . . . themselves and other employees similarly situated.'" *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989) (quoting 29 U.S.C. § 216(b)). For an ADEA case to proceed as a collective action, the potential plaintiffs (1) must be "similarly situated," and (2) must consent in writing to become parties to the action. 29 U.S.C. § 216(b).

Certification of a collective action proceeds in two steps. In the first step, which is typically conducted early in the litigation when the court has minimal evidence, the court conducts a preliminary inquiry into whether the proposed collective action members are similarly situated. *Harris*, 2007 U.S. Dist. LEXIS 55221, at *6; *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 U.S. Dist. LEXIS 21010, at *4 (E.D. Pa. Nov. 13, 2003). Although the FLSA does not define the

term "similarly situated," district courts in this Circuit have held plaintiffs are similarly situated if they "were together the victims of a single decision, policy, or plan infected by discrimination." *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988); *see also Lugo v. Farmer's Pride Inc.*, No. 07-749, 2008 U.S. Dist. LEXIS 17565, at *8 (E.D. Pa. Mar. 7, 2008). At this initial stage, a plaintiff is required to make only a "modest factual showing" that the potential plaintiffs are similarly situated.[6] *Harris*, 2007 U.S. Dist. LEXIS 55221, at *9; *Smith*, 2003 U.S. Dist. LEXIS 21010, at *10. This is an "extremely lenient standard"; the plaintiff "need only provide some 'modest' evidence, beyond pure speculation, that [the] [d]efendant's alleged policy affected other employees." *Id.* If a plaintiff makes the required showing, the court may grant conditional certification for the purpose of notice and discovery. *Lugo*, 2008 U.S. Dist. LEXIS 17565, at *8; *see also Sperling*, 493 U.S. at 169 (1989) (holding district courts have discretion to facilitate notice to potential plaintiffs in an ADEA collective action).

In the second step, which usually occurs after merits discovery has occurred, the court conducts a "specific factual analysis of each employee's claim to ensure that each proposed plaintiff is an appropriate member of the collective action." *Lugo*, 2008 U.S. Dist. LEXIS 17565, at *8. Although the court's analysis at the second step again focuses on whether the plaintiffs are similarly situated, the court "will require a higher level of proof than was necessary at the first stage for

---

[6] Some district courts within this Circuit have applied an even more lenient standard at the first step, requiring only "substantial allegations" that the potential plaintiffs are similarly situated. *E.g.*, *Sperling*, 118 F.R.D. at 407. More commonly, however, district courts apply the "modest factual showing" standard, noting that the substantial allegation approach would "render preliminary class certification automatic, as long as the Complaint contains the magic words: 'Other employees similarly situated.'" *Smith*, 2003 U.S. Dist. LEXIS 21010, at *7-10; *see also, e.g.*, *Harris*, 2007 U.S. Dist. LEXIS 55221, at *8-9; *Bosley v. Chubb Corp.*, No. 04-4598, 2005 U.S. Dist. LEXIS 10974, at *9-10 (E.D. Pa. June 3, 2005).

conditional certification." *Id.*; *see also Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388-89 & n.17 (3d Cir. 2007) (discussing the differences in plaintiffs' burdens at the conditional certification and decertification stages). "If the conditional group of plaintiffs does not meet [the similarly situated] standard at the second stage, the group is then decertified, the opt-in plaintiffs are dismissed without prejudice and any remaining plaintiffs are permitted to move onto the trial stage of litigation." *Lugo*, 2008 U.S. Dist. LEXIS 17565 at *8-9; *see also Ruehl*, 500 F.3d at 388 n.17 ("At the 'reconsideration phase,' after potential class members have filed their consents to opt in and after there has been further discovery to support the plaintiffs' allegations, a district court may revoke conditional certification if the proposed class dose not meet FLSA's 'similarly situated' requirement.").

Here, Plaintiffs have produced affidavits suggesting Penn Mutual undertook a series of layoffs beginning in 2009 to reduce personnel at the company's home office by 50 to 100 employees. Beauchamp Aff. ¶¶ 5-7; Crews Aff. ¶ 14; Gruccio Aff. ¶ 13. Plaintiffs have also produced affidavits and documentary evidence suggesting the layoffs were discussed, planned, and reviewed office-wide by Penn Mutual's Executive Team and that the information reviewed included the ages of employees selected for termination. Beauchamp Aff. ¶¶ 5, 8, 10-12 & Ex. A. Plaintiffs additionally have presented some evidence that Penn Mutual's management had a desire to create a younger workforce. *See id.* ¶ 14 (stating that Executive Team's succession planning discussions included discussions of "pipeline" employees to replace older workers who would be eliminated or who were assumed to retire and who "were, almost invariably, significantly younger" than employees being replaced); Crews Aff. ¶¶ 8 (describing statements by Penn Mutual executives indicating a desire to hire people "born after the Eisenhower administration" and people with the energy to stay at Penn Mutual for at least 15 to 20 years), 10 (stating Chappell's words and actions indicated he "was

7

looking to create a younger executive team") 13 (stating Penn Mutual executives openly discussed the need for older workers to "move on" so as to create promotional opportunities for younger workers); Gruccio Aff. ¶¶ 7, 9, 12 (same).[7]

Penn Mutual produced detailed affidavits from individuals involved in the termination decisions which dispute Plaintiffs' contentions that there was central control of such decisions and that age was a factor in any of them. While such evidence undoubtedly will be highly relevant to the analysis of whether potential collective action members are similarly situated, it is more properly considered at the post-discovery decertification stage. *See Pontius v. Delta Fin. Corp.*, No. 04-1737, 2005 WL 6103189, at *3 n.12 (W.D. Pa. June 24, 2005) (noting a defendant's affidavits contradicting a plaintiff's factual assertions should not alter the court's conclusion that the plaintiff had "met the lenient test for conditional certification"); *Felix De Asencio v. Tyson Foods, Inc.*, 130 F. Supp. 2d 660, 663-64 (E.D. Pa. 2001) (holding plaintiffs need not "counter every assertion" made by a defendant at the conditional certification stage as the defendant "already has access to all of the information it requires concerning the running of its own facilities, while [p]laintiffs may only have this information after discovery is completed"); *see also Betancourt v. Maxim Healthcare Servs., Inc.*, No. 10-4763, 2011 WL 1548964, at *7 (N.D. Ill. Apr. 21, 2011) (noting the weight to be given a defendant's affidavits at the conditional certification stage must be "tempered" by the fact that the

---

[7] Penn Mutual argues that Crews's and Gruccio's assertions relating to an alleged culture of age discrimination at Penn Mutual are irrelevant because they pertain only to Penn Mutual's field personnel, who are not employees of the home office and are not potential collective action members. However, it is not clear that all of Crews's and Gruccio's statements are so restricted. Moreover, even the portions of the affidavits that expressly relate to field personnel involve alleged bias exhibited by home office executives. *See* Crews Aff. ¶ 13 (describing a conversation with O'Donnell regarding the importance of obtaining agreements from older field managers to retire at a certain age so as to create opportunities to promote younger employees).

statements in the affidavits "have not been subjected to the adversary process").[8]

Moreover, although Penn Mutual argues conditional certification is inappropriate because the potential opt-in plaintiffs held different jobs in different departments at the home office and were terminated at different times, these considerations do not preclude conditional certification in the context of what Plaintiffs allege was a coordinated reduction of the home office work force based on employees' ages. *See Williams v. Sprint/United Mgmt. Co.*, 222 F.R.D. 483, 487 (D. Kan. 2004) (holding the fact that plaintiffs held different positions in different business units, working under different managers was not fatal to conditional certification of a collective action challenging a discriminatory reduction in force planned and implemented over an 18-month period); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 483 (E.D.N.Y. 2001) ("[I]n order to be 'similarly situated,' the plaintiffs do not have to perform the same job in the same location as long as there is a discriminatory policy common to all."); *Owens v. Bethlehem Mines Corp.*, 108 F.R.D. 207, 212 (S.D. W. Va. 1985) (holding plaintiffs from different departments were similarly situated notwithstanding that personnel decisions were made by different managers, noting "the nature of a reduction in force

---

[8] *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264 (D. Minn. 1991), on which Penn Mutual relies, is not to the contrary. In *Severtson*, a district court reversed a magistrate judge's order authorizing notice to potential plaintiffs in an ADEA collective action case where the only support for the plaintiffs' contention a class of similarly situated employees existed was the allegations in their complaint that their terminations "were part of a 'recent pattern and practice of eliminating older, more highly paid employees and replacing them with younger, lesser paid employees,'" and that the defendants' headquarters "control[led] 'virtually all aspects of employment' of the 750 employees.'" *Id.* at 266 (citation omitted). The district court found the plaintiffs' mere allegations insufficient to support conditional certification, and held the plaintiffs were instead required to "show[] that there [was] some factual basis for the class allegations." *Id.* at 267. Although the court noted requiring a factual showing was "particularly appropriate . . . given that defendants have challenged the allegations of the complaint by submitting affidavits and deposition testimony," *id.*, the court did not suggest it was appropriate to weigh the evidence at the conditional certification stage. Here, Plaintiffs have provided detailed affidavits sufficient to create the required modest factual showing.

. . . makes [a] broader class definition appropriate").

Given the "extremely lenient" standard that applies at the conditional certification stage, this Court finds Plaintiffs' affidavits and documentary evidence sufficient to satisfy their burden to make a modest factual showing that they and other employees age 40 and older terminated as part of the expense reduction layoffs in 2009 and 2010 were affected by a single plan "infected by a discriminatory aspect."[9] *Sperling*, 118 F.R.D. at 406; *see Mueller v. CBS, Inc.*, 201 F.R.D. 425, 428-29 (W.D. Pa. 2001) (finding plaintiffs had demonstrated a sufficient factual basis that potential ADEA collective action members were similarly situated with evidence of a corporate-wide policy of eliminating older employees who were slowing the upward career progress of younger employees, including excerpts from reports of the CEO's meetings with upper level managers, the "tone of which . . . reflect[ed] a corporate culture antagonistic to older workers"); *Rodolico*, 199 F.R.D. at 482-83 (finding engineers aged 40 and above terminated from a company's headquarters during a single reduction in force were similarly situated, notwithstanding that individual managers had discretion to determine who was ultimately terminated, based in part on evidence "managers and vice presidents allegedly made discriminatory comments and voiced a desire to reduce the number of older workers and to lay off the senior-most engineers at the plant"); *Church v. Consol. Freightways,*

---

[9] The parties disagree about the time period during which terminations resulting from Penn Mutual's expense reduction efforts were ongoing. Plaintiffs seek conditional certification of a group composed of "any individual who was employed to work at [Penn Mutual's] home office in Horsham, PA, and whose employment was terminated by [Penn Mutual] as part of an alleged reduction in force, reorganization, or job elimination between May 22, 2009 and December 31, 2010." Penn Mutual argues that because the company's "efforts to redeploy resources from Home Office expenses to support the Field distribution system had effectively ended [by the end of the first quarter of 2010]," conditional certification of a group of individuals terminated through all of 2010 is improper. Def.'s Opp'n to Mot. to Proceed as Collective Action 4 n.2. The parties shall address the issue of the proper scope of the collection action as part of the meet-and-confer process regarding class notice.

*Inc.*, 137 F.R.D. 294, 304 (N.D. Cal. 1991) (finding plaintiffs made a sufficient showing that employees age 40 and older terminated following a corporate acquisition and consolidation were similarly situated for purposes of conditional certification based on a document describing anticipated cost savings as a result of the terminations and declarations "tend[ing] to show that the terminations . . . were in part based on age").[10]

Accordingly, Plaintiffs' motion to proceed as a collective action will be granted, and the Court will approve the issuance of a notice to all potential collective action members, whose identities shall be provided by Penn Mutual. The Court emphasizes that, by its nature, this conditional certification ruling is preliminary and will be revisited at the decertification stage after a more complete record is developed during discovery. *Sperling*, 118 F.R.D. at 407 (explaining the fact conditional certification has been granted does not "prevent the court from modifying or reversing a decision on 'similar situations' at a later time . . . as new facts emerge").

An appropriate order follows.

BY THE COURT:

   /s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

[10] In light of this holding, the Court need not address Plaintiffs' alternative argument that conditional certification is warranted based solely on the evidence of a centrally orchestrated plan to reduce the home office work force by 50 to 100 employees because they have alleged a disparate impact claim.